IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MICHAEL RASKO, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | C.A. No. 25-425-RGA |
| | ) | |
| ROTHBRIGHT INC., DANIEL PATTON, and | ) | FILED |
| MARCUS FRYE, | ) | |
| | ) | |
| Defendants. | ) | JAN 2 3 2026 |

REPORT AND RECOMMENDATION

Pending before the Court is Defendants' Motion to Dismiss the First Amended Complaint ("FAC") for Failure to State a Claim (D.I. 16), which has been fully briefed. (D.I. 17, 20, 22). Plaintiff Michael Rasko ("Plaintiff") seeks a declaration that Defendants Rothbright Inc. ("Rothbright" or the "Company"), Daniel Patton ("Patton"), and Marcus Frye ("Frye") (collectively, "Defendants") violated the Stockholder Agreement (the "Agreement") by improperly deeming Plaintiff a "Dissociated Holder" whose shares are subject to Section 3(a)(ii) of the Agreement. Plaintiff also asserts a breach of the implied covenant of good faith and fair dealing. For the following reasons I recommend that Defendants' Motion to Dismiss be GRANTED-IN-PART and DENIED-IN-PART.

I.   BACKGROUND

Rothbright is a Delaware corporation formed on December 15, 2022, with Patton as its sole director and CEO, and Frye as its COO. (FAC ¶¶ 12–13, 15–18). Plaintiff became a 7.5% preferred shareholder of Rothbright on January 1, 2023, when he merged his company, Rasko Digital Marketing LLC, with Patton's company, Perimark, into Rothbright in exchange for 964,286 preferred shares. (*Id.* ¶¶ 3, 24, 37). Plaintiff alleges that he was never employed by

Rothbright, never signed an employment or independent contractor agreement, was never given a salary placed on payroll or reimbursed for expenses, and did not receive his equity in exchange for any service he provided. (*Id.* ¶¶ 26–27, 121). Rather, Plaintiff contends that he received shares as part of a merger of his prior company with Patton's prior company, that as part of becoming a shareholder he brought clients from his former company to Rothbright, and that he did not receive his shares in exchange for employment or a promise to perform services for Rothbright. (*Id.* ¶¶ 24–27). Plaintiff further alleges that his shares were "preferred" and "founder level equity." (*Id.* ¶¶ 31, 34, 35). In addition, Plaintiff alleges that he was told by Patton that he would get additional shares once he started as an employee from the employee pool of shares, which was separate from the "preferred" stock Plaintiff had already received as a founder. (*Id.* ¶¶ 40–42). Plaintiff details numerous conversations and exchanges that he says make clear that he could do things to entitled him to "employee equity in the employee pool," but that "[Plaintiff] ha[d] preferred shares." (*Id.* ¶ 44).

For example, Plaintiff received an email from Patton on December 5, 2023, that he, among others, were part of the "founding group" and had been issued "founder level equity" but that he would need to re-sign the shareholder agreement to prevent dilution of the preferred shares he currently held. (FAC ¶¶ 34, 35). It appears that Plaintiff signed the original Agreement on September 4, 2023, but it is not clear whether the "new" agreement memorializing two new investors and Plaintiff's shares at 7.5% was ever sent to or signed by Plaintiff. (*Id.* ¶ 37; Ex. A at 18; D.I. 17-1, 17-2). On June 27, 2024, Patton assured Plaintiff during a meeting that his preferred shares were "non-dilutable" and that his "founder" shares were different than those that would be issued subsequently to employees. (D.I. 13 ¶¶ 39–43).

On July 21, 2024, however, Patton and Frye informed Plaintiff that his stake in Rothbright would be reduced from 7.5% to 2.5%. (*Id.* ¶¶ 54–57). The next day, Frye told the other partners that this reduction was to make space for new investors. (*Id.*). On August 2, 2024, Plaintiff, his counsel, and Defendants met to discuss, as Plaintiff understood it, how to reduce Plaintiff's stake in the company from 7.5% to 2.5%. (*Id.* ¶¶ 70–80). Instead, Plaintiff alleges that Patton, Frye, and Josh Fitch, counsel for Rothbright, assumed that Plaintiff had agreed to leave the company and liquidate his entire share. (*Id.* ¶ 83). After the meeting, Fitch contacted Plaintiff's counsel and asked that Plaintiff sign a resignation letter; Fitch then followed up via email on August 7, 2024, asking whether Plaintiff "intended to resign," adding that Plaintiff would be terminated if Fitch did not receive Plaintiff's resignation letter "in the next couple of days." (*Id.* ¶¶ 87–92). Thereafter, on September 6, 2024, Patton sent Plaintiff an "Agreed value Notice" (the "Notice") which stated that on July 21, 2024 Plaintiff had expressed his desire to separate from the company and that he had resigned. (FAC ¶ 96–97). The Notice further stated that pursuant to Section 3(a)(ii) of the Agreement, that Plaintiff's resignation triggered a "Buy/Sell Event" that and Plaintiff became a "Dissociated Holder," meaning that Defendants could exercise their option to purchase all of Plaintiff's shares. (*Id.* ¶ 97). Section 3(a)(ii) provides that:

> (a) **Buy/Sell Agreement in General.** A Stockholder shall become a "**Dissociated Holder**" to the extent the Stockholder's Shares become the subject of a Buy/Sell Event. Any of the following constitute a "**Buy/Sell Event**" under this Agreement: . . .
>
>> (ii)   the termination by the Company of the Stockholder's employment (in the event the Stockholder is employed by, or otherwise provides services to, the Company) with or without cause, or the voluntarily [sic] termination or resignation of the Stockholder's employment by the Stockholder (in the even the Stockholder is employed by, or otherwise provides services to, the Company)

(FAC, Ex. A at 4–5) (emphasis in original).

3

On September 11, 2024, Plaintiff responded to the Notice and disputed that he had become a "Dissociated Holder" under Section 3(a)(ii), and he also objected to the improper valuation of his shares. (*Id.* ¶¶ 98–102, 129–33).

## II.   LEGAL STANDARD

When reviewing a motion to dismiss under Rule 12(b)(6), the Court must construe all allegations and facts in the light most favorable to the plaintiff and resolve all reasonable inferences in plaintiff's favor. *See, e.g., Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005); *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008); *Rocks v. City of Phila.*, 868 F.2d 644, 645 (3d Cir. 1989). A Rule 12(b)(6) motion may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court concludes that those allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). The complaint need not contain detailed factual allegations, but conclusory allegations and "formulaic recitation[s] of the elements of a cause of action" are insufficient to give the defendant fair notice of the nature of and grounds for the claim. *Twombly*, 550 U.S. at 555. The complaint must contain facts sufficient to show that a claim has "substantive plausibility." *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (per curiam). While this plausibility standard requires more of the complaint than allegations supporting the mere possibility that the defendant is liable as alleged, plausibility should not be taken to mean probability. *Twombly*, 550 U.S. at 545. A claim is facially plausible, and the standard is satisfied, when the claim's factual allegations, accepted as true, allow the court to reasonably infer that the defendant is liable as alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 1948 (2009). When reviewing a motion to dismiss under Rule 12(b)(6), the Court must "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputably

authentic documents in the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

### III. DISCUSSION

Defendants largely challenge the truth of the FAC's factual allegations rather than their sufficiency in stating a claim. First, Defendants argue that Plaintiff's allegations are wrong—that Plaintiff's shares are in fact subject to Section 3(a)(a)(ii) such that once Plaintiff's employment/provision of services ended, Defendants were within their contractual rights to force a sale of all of Plaintiff's shares in Rothbright. (D.I. 17 at 12). Second, Defendants argue that Plaintiff's claim for a breach of the implied covenant of good faith and fair dealing must be dismissed because it lacks the requisite specificity. (*Id.* at 17). I address each argument in turn.

#### a. Whether Plaintiff's Shares Are Subject to Section 3(a)(ii)

Defendants move to dismiss Count I of the FAC because they claim that, based on the plain language of the Agreement and certain facts that they claim are undisputed, Plaintiff's shares are unquestionably subject to Section 3(a)(ii), and that Plaintiff is a "Dissociated Holder" as a matter of law. The trouble for Defendants is that, with respect to several of the facts that they assert are undisputed, the facts are very much in dispute.

Defendants assert that it is undisputed that Plaintiff's shares are governed by Section 3 of the Agreement because Plaintiff "provided services to Rothbright between September 2023 and July 21, 2024." (*Id.*). The FAC, however, pleads that Plaintiff was never employed by Rothbright, was never under any obligation to provide services to it, and was never compensated for any such services if provided. (FAC ¶ 43). Plaintiff also pleads that he was repeatedly told that he could be eligible for "employee equity in the employee pool," and that doing work for the Company would be a way to "get compensated" for work he had put in as a founding owner. (*Id.* ¶¶ 39–45).

5

Despite Defendants' repeated promises to create "Contractor Agreements" to ensure compensation, no such agreement was ever sent to Plaintiff nor, according to Plaintiff, was the contemplated agreement "connected in any way with his preferred shares in the Company." (*Id.* ¶ 49). Additionally, Plaintiff pleads that he was never asked to perform any specifically outlined services, that he had no official title, and that he never signed any document stating that he was employed by or obligated to provide services to the Company. (*Id.* ¶ 50). Anything Plaintiff did for the Company, he contends, was as an owner and out of his desire to see the Company grow and succeed. (*Id.* ¶ 55). And, Plaintiff pleads, if Patton "had wanted [Plaintiff] to be an employee and subject to Section 3 of the Stockholder Agreement, he made no discernable effort toward it." (*Id.* ¶ 52). Last, Plaintiff claims that once Patton determined that he wanted to dilute Plaintiff's shares, "Patton expressly stated that no matter what, [Plaintiff's] shares would be reduced from 7.5% to 2.5%" and there was nothing Plaintiff could propose that would allow him to keep his 7.5%. (*Id.* ¶¶ 57–58). Certainly, if Patton was telling Plaintiff that there was no way to keep his shares at 7.5%, then Section 3 and the alleged cessation of services to the Company was not the reason for diluting Plaintiff's shares—that is, even the continuation of services or employment (if any) would not have saved Plaintiff's shares.

Defendants also claim it is undisputed that Plaintiff ceased providing services to the Company on or around July 21, 2024, thus triggering his status as a Dissociated Holder. (D.I. 17 at 2). But Plaintiff pleads that, to the extent anything Plaintiff did could be construed as "providing services" under Section 3, that he neither ceased doing so as of July 21, 2024, nor did he resign. (FAC ¶¶ 91–95, 98). Indeed, Plaintiff was asked by Patton and Frye on July 30, 2024, whether he was going to handle a call with a Company client. (FAC ¶ 73). On August 2, 2024, Fitch asked Plaintiff's counsel to sign a resignation letter. (*Id.* ¶ 87). Fitch then emailed Plaintiff's counsel on

6

August 2, 2024, and said that he would "like to request [Plaintiff's] resignation, prior to proceeding with any formal termination." (*Id.* ¶ 90). On August 7, Fitch again emailed Plaintiff's counsel asking whether Plaintiff "intended to resign," adding that Plaintiff would be terminated if he did not resign soon. (*Id.* ¶ 92). In addition, Plaintiff avers that Defendants' own actions make it clear that his "service" or "employment," however defined and if it existed, never ended. (*Id.* ¶ 94). This is because as late as August 22, 2024, and October 22, 2024, Plaintiff was still being contacted by a client and a subcontractor about business with the Company because Defendants never notified any clients of his departure. (*Id.* ¶¶ 94–95). The subcontractor claimed that Patton told him that "[Plaintiff] was no longer involved in operations," which led him to believe that Plaintiff was still with the Company but in another role. (*Id.* ¶ 95). Taking all facts pled as true, and giving every reasonable interference to Plaintiff, it is not undisputed that Plaintiff voluntarily ceased whatever employment he had, that he ever had employment, that he ever provided services or that he ever ceased providing services to Rothbright. Thus, Plaintiff's request that the Court declare that he is not a Dissociated Holder and that his shares are not subject to Section 3 of the Agreement states a claim.[1] Accordingly, I recommend that Defendants' Motion to Dismiss Count I of the FAC be denied.

### b. Breach of the Implied Covenant of Good Faith and Fair Dealing

The implied covenant is a "limited and extraordinary legal remedy," (*OC Tint Shop, Inc. v. CPFilms, Inc.*, 2018 WL 4658211, at *5 (D. Del. Sept. 27, 2018) (internal quotation marks omitted) that is "rarely invoked successfully." *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 888 (Del. Ch. 2009); *Goddess Approved Prods., LLC v. Wolox*, 2022 WL 4535620, at *4 (D. Del.

---

[1] Defendants ask me to determine that the Agreement is unambiguous; Plaintiff says the Agreement is ambiguous. I need not reach that issue to determine that Count I states a claim.

Sept. 28, 2022). "'To sufficiently allege a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must allege (1) a specific obligation implied in the contract, (2) a breach of that obligation, and (3) resulting damages.'" *Sapp v. Indus. Action Servs., LLC*, 2024 WL 3444633, at *5 (D. Del. July 17, 2024) (quoting *OC Tint Shop*, 2018 WL 4658211, at *4). The purpose of the implied covenant is to prevent the parties to a contract from perpetrating any "arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010) (internal quotation marks omitted). Applying the doctrine requires "inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated." *Id.* at 1125; *see also Sapp*, 2024 WL 3444633, at *5. Accordingly, "the Court must first determine whether there is a contractual gap" related to a specific obligation expressly contained in the contract. *OC Tint Shop*, 2018 WL 4658211, at *5.

Here, there is no gap in the contract because the gravamen of Plaintiff's claims are covered by express language of the Agreement. Although the issue of employment and service and the termination of either is hotly contested by the parties, at the end of the day, Section 3(a)(ii) either applies to Plaintiff and justifies Defendants' actions, or it does not. I see no need for the Court to engage in the extraordinary remedy of implying contractual terms. In declining to do so, I note that I have fully considered and appreciated Plaintiff's argument that the contract should be read to include terms related to "founder" or "preferred" stock. (D.I. 20 at 3–4, 16–17). But it is difficult to see the propriety of reading those terms in when the Agreement explicitly lists Plaintiff's stock as "common." (D.I. 13-2, Exhibit A); *see also Sharma v. TriZetto Corp.*, 2016 WL 1238709, at *7 (D. Del. Mar. 29, 2016) (granting motion to dismiss because Plaintiff's allegations related to conduct "governed by the express terms of the [agreement]" had failed to

allege facts "demonstrating that the parties' conflict falls into a gap in the contract"). Moreover, if Plaintiff was not employed by Defendants in whatever capacity is contemplated by Section 3(a)(ii), then Defendants' actions may be unjustifiable; thus, inserting Court-created terms and definitions for rights that the parties did not expressly include themselves seems ill-advised.

Plaintiff also argues that the Court should imply terms because the Defendants "engaged in arbitrary or unreasonable conduct" to deprive him of the benefits of his bargain. (D.I. 13 ¶ 180). Plaintiff's claim, essentially, alleges that Defendants engaged in bad faith and treated him unfairly. That is insufficient to state a claim for breach of the implied covenant. Defendant's opening brief accuses Plaintiff of including little more than "general allegations of bad faith conduct" and failing to "allege a specific implied contractual obligation and how the violation of that obligation denied the plaintiff the fruits of the contract." (D.I. 17 at 19 (citing *Truinject Corp. v. Nestlé Skin Health, S.A.*, 2020 WL 70981, at *14 (D. Del. Jan. 7, 2020))). In his answering brief in response, Plaintiff argues that the FAC alleges the "existence of an implied contractual obligation to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." (D.I. 20 at 17). This is not good enough. Under Delaware Plaintiff must identify a specific implied contractual obligation that Defendants breached, and he has failed to do so. Accordingly, I recommend that Defendants' motion to dismiss Count II be granted.

### c. Claims against Individual Defendants Patton and Frye

Plaintiff's claims against Patton and Frye are entirely dependent upon Count II. (*See* FAC ¶¶ 168–181). Having recommended dismissal of Count II for failure to state a claim for a breach of the implied covenant, I similarly recommend that Defendants' motion to dismiss the FAC as to Patton and Frye be granted.

## IV. CONCLUSION

For the foregoing reasons, I recommend that Defendants' Motion to Dismiss Count I of the FAC be DENIED. With respect to Count II and the claims against Patton and Frye, I recommend that Defendants' Motion to Dismiss be GRANTED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), (C), Federal Rule of Civil Procedure 72(b)(1), and D. Del. LR 72.1. Any objections to the Report and Recommendation shall be filed within fourteen days and limited to ten pages. Any response shall be filed within fourteen days thereafter and limited to ten pages. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court.

The parties are directed to the Court's "Standing Order for Objections Filed Under Fed. R. Civ. P. 72," dated March 7, 2022, a copy of which can be found on the Court's website.

Dated: January 23, 2026

_____
Laura D. Hatcher
United States Magistrate Judge